Belknap, ⎱
Dec., 1896. ⎰

## THOMPSON, *Assignee, v.* ESTY.

Under P. S., c. 201, s. 26, an assignee in insolvency cannot avoid a sale by
the debtor, made in good faith and for a sufficient consideration, on the
ground that it was fraudulent as to creditors because possession of the
property was retained by the vendor.

TROVER, by the assignee in insolvency of the Laconia Man-
ufacturing Company, for certain machinery. November 18,
1893, the company were engaged in the manufacture of knit
goods, and rented of the defendant a part of the mill building which
they occupied and a portion of the machinery which they oper-
ated. Prior to that date, the company had purchased other
machinery for use in the business and operated it in different rooms
of the mill, intermingled with the leased machinery. The con-
version alleged is of the machinery so purchased and used..
Some of this machinery was of great weight, all of it was con-
nected with shafting and in running order, and a portion of it
was so framed in position as to have passed by a deed of the
realty if the company had owned and conveyed the premises.

November 18, 1893, the defendant made a loan of $4,000 to
the company and took a bill of sale of all their machinery and fix-
tures then in the mill. On the same date, he leased the same
machinery to the company for a term of six months and agreed
in writing to reconvey it at any time within six months, upon
payment to him of the sum loaned, with interest. The defendant
checked off the various pieces of machinery mentioned in the
schedule of the bill of sale, for the purpose of taking possession,
and instructed his employee in charge of his own machinery in
the mill to care for and keep in repair the machinery in question.
Otherwise the company had the same occupation and use of the
machinery, and their manager had the same control of it, as be-
fore the sale and lease. It was not claimed by the plaintiff that
there was any actual fraud in the transaction.

January 29, 1894, the Laconia Manufacturing Company was
petitioned into insolvency, and February 12, 1894, an assignee
was appointed. Prior to the commencement of this suit, August
14, 1894, the defendant leased his mill and all the machinery
therein to third parties and also sold a part of the machinery.
By direction of the court the jury returned a special verdict,
finding that the machinery in controversy was demanded of the
defendant by the assignee before suit was brought, that its market
value was $4,207.62, and that the assignee consented to the
lease of the property by the defendant.

The defendant excepted to a denial of his motion for a nonsuit made at the close of the plaintiff's evidence, to a denial of his motion that a verdict be directed in his favor made upon the return of the special verdict, and to the order of the court that a general verdict be entered for the plaintiff for $4,207.62, with interest from the date of the writ.

*E. A. & C. B. Hibbard* (with whom were *Frank M. Beckford* and *Edwin H. Shannon*), for the plaintiff. The defendant gave the Laconia Manufacturing Company, of which the plaintiff is assignee, his notes for $4,000, on which they realized that amount, less the discount. The company gave the defendant an absolute bill of parcels of the property described in the writ and therein alleged to have been converted. A sort of delivery of the property was made, but the property was left in the same place and was used by the company after the sale as it had been used before, there being at the most a concurrent possession by the defendant, with nothing whatever to give publicity to the sale. The defendant gave back to the company a lease of the property for six months, at a rental of $120, and an agreement to reconvey it to them within six months on payment of $4,000 and interest.

The transaction was void as to creditors, because there was an agreement, made at the same time but not in the same instrument with the bill of parcels, that the property should remain in the company's hands, and also an agreement, made in the same way, that the company should have a right of repurchase. Each of these agreements was a secret trust, and the mere retention of possession, unless explained to the satisfaction of the court, is conclusive evidence of a secret trust. That a secret trust attending a sale or a mortgage renders it fraudulent and void as to creditors was early established in this state, and the principle has been often and lately reaffirmed. *Coburn* v. *Pickering*, 3 N. H. 415; *Parker* v. *Pattee*, 4 N. H. 176; *Trask* v. *Bowers*, 4 N. H. 309; *Smith* v. *Lowell*, 6 N. H. 67; *Paul* v. *Crooker*, 8 N. H. 288; *Winkley* v. *Hill*, 9 N. H. 31; *Page* v. *Carpenter*, 10 N. H. 77; *Tifft* v. *Walker*, 10 N. H. 150; *Smith* v. *Moore*, 11 N. H. 55, 65; *Ladd* v. *Wiggin*, 35 N. H. 421, 426; *Coolidge* v. *Melvin*, 42 N. H. 510; *Lang* v. *Stockwell*, 55 N. H. 561; *Cutting* v. *Jackson*, 56 N. H. 253; *Plaisted* v. *Holmes*, 58 N. H. 293; *Sumner* v. *Dalton*, 58 N. H. 295; *Flagg* v. *Pierce*, 58 N. H. 348; *Parker* v. *Marvell*, 60 N. H. 30; *Sanborn* v. *Putnam*, 61 N. H. 506; *McDonough* v. *Prescott*, 62 N. H. 600; *Stratton* v. *Putney*, 63 N. H. 577; *Watkins* v. *Arms*, 64 N. H. 99.

These cases settle, among other things, that a conveyance intended as a security for money but made absolute in form, the defeasance being in a separate instrument or by parol, whether it

be or be not in this state a mortgage, is sharply distinguished from an ordinary mortgage, in which the conveyance and the defeasance are contained in the same instrument. This distinction is presented in several of the cases, but most clearly in a case that arose before the act of 1832, which first provided for a record of personal mortgages. Laws 1832, c. 80. Before that statute, an ordinary mortgage of personal property might be valid against creditors, although the mortgagee had not taken possession. *Haven* v. *Low*, 2 N. H. 13; *Ash* v. *Savage*, 5 N. H. 545; *Hoit* v. *Remick*, 11 N. H. 285. But an absolute bill of parcels of property and delivery of it to a creditor, with an oral agreement that he should sell it, apply the proceeds on his debt, and account for any surplus, the creditor taking and retaining possession, was held void as to creditors, although there was no surplus and had been no prospect of any. *Parker* v. *Pattee*, 4 N. H. 176. If that decision is open to any criticism, it is in applying the principle to a case where the debt was much larger than the value of the property; but the general reasoning of the opinion is strong, and the weak point (if it exists) is not found in the present case. If the defendant in this case had taken and kept exclusive possession immediately, instead of after the company's embarrassment, if the company had agreed that he might dispose of the property by private sale without notice, and if the value of the property had been less than the debt, instead of being more, as the jury found,—no one of which circumstances could possibly weaken the defendant's case,—the two cases would have been exactly parallel. It is true that that case was wholly, and this only partially, a preference; but the attaching creditor could not take advantage of a preference, while the assignee in insolvency can.

The grounds on which conveyances attended with a secret trust are deemed fraudulent as to creditors, and an unexplained lack of change of possession is deemed conclusive evidence of a secret trust, have never been better stated in this state, nor probably elsewhere, than by Chief Justice *Richardson*. In *Coburn* v. *Pickering*, 3 N. H. 415, he says: " All conveyances with secret reservations for the benefit of the vendor tend directly to hinder and delay creditors. They hold out false colors and false appearances, and mislead and deceive creditors. They give to the property of the vendor the appearance of belonging wholly to another, when, in truth, he has an interest in it, concealed under the trust. It is for this reason that a trust of this kind is, in law, a fraud. As the obvious tendency of these reservations and trusts is to deceive and defraud creditors, it has not been deemed necessary to stop to inquire into the particular views or motives of individuals in each case: but all courts, relying on the presumption that every man intends the probable consequences of his acts, have at once pronounced all these trusts to be frauds, not only within the meaning

of the 13 Eliz., *c.* 5, but at common law; and have held that sales without any trust whatever, and such sales alone, are to be considered as *bona fide* sales with respect to creditors. . . . In order to increase the difficulties of fraud, courts have thought it expedient to require certain signs of good faith, which cannot be reconciled with fraudulent purposes. One of these signs is, that possession shall accompany and follow the sale of personal chattels. . . . No rule could have been devised better calculated to check fraud. . Nothing has been found so embarrassing to those who have been disposed to act without good faith."

It will be seen that there are two considerations advanced to support the conclusions reached. One is that such a transaction is usually fraudulent, and a particular transaction of that kind is probably so, even though an actual fraudulent intention cannot be shown; so that the result of applying the rule will probably be correct in the particular case. The other is that such a mode of doing the business affords great opportunities for fraud, and a safer mode can effectuate every honest purpose; so that it is wise, as a matter of public policy, to hold such a transaction void by a general rule analogous to the statute of frauds or to the requirement of a deed for a transfer of land. The statement in *Twyne's Case*, 3 Co. 80, that " no gift shall be deemed to be *bona fide* within the said proviso which is accompanied with any trust," is stated as matter of law, and not merely as an argument approved by the court (the star chamber) as a trier of facts. If this construction of " *bona fide* " was an instance of judicial legislation, it was at any rate adopted as a part of our common law and has now stood too long to be questioned for that reason.

It may be contended that the statute (P. S., *c.* 201, *s.* 26), in providing that " all pledges, payments, mortgages, sales, and transfers, whenever made, if fraudulent as to creditors, shall be void," refers to actual, as distinguished from constructive, fraud; but no such distinction is tenable. By the bankrupt act of 1867, it is provided that "all property conveyed by the bankrupt in fraud of his creditors . . . shall . . . be . . . vested in such assignee." U. S. R. S., *s.* 5046. No reason appears for distinguishing between the two expressions, " if fraudulent as to creditors," and "in fraud of his creditors." But it is well settled that the latter expression includes frauds that are proved only by an inference of law from facts that do not conclusively prove them by ordinary rules of reasoning,— the so-called constructive frauds or frauds in law. *Edmondson* v. *Hyde*, 2 Saw. 205; *In re Morrill*, 2 Saw. 356; *Allen* v. *Massey*, 17 Wall. 351; *Robinson* v. *Elliott*, 22 Wall. 513; *In re Manley*, 2 Bond 271; *In re Kahley*, 2 Biss. 383; *Smith* v. *Ely*, 10 N. B. R. 553; and other cases collected in Bump B'k'cy, in the notes to the section above cited. In *Edmondson* v. *Hyde*, *supra*, will be found an extended discus-

sion of the question, showing clearly the unreasonableness and
the mischievousness of a different interpretation.

In some of the above cases, there were state statutes establish-
ing the law as to constructive fraud similarly to the law estab-
lished in this state by judicial decisions; thus, in *Edmondson* v.
*Hyde,* the statute of California made a sale, unless accompanied
by immediate delivery and followed by actual and continued
change of possession, conclusive evidence of fraud as against cred-
itors or subsequent purchasers in good faith; and in *Massey* v.
*Allen,* the statute of Missouri provided that a sale unaccompa-
nied by delivery should (with certain exceptions) be held to be
fraudulent and void as against the same persons.   By U. S.
R. S., *s.* 721, the laws of the several states are to be regarded as
rules of decision in trials at common law in the federal courts,
and the "laws" mentioned are held to be statutes and not judi-
cial decisions; but this will be found not to affect the value of
the authorities cited.   Several of them were not at common
law, and are, therefore, clearly authorities as to adopting state
decisions as well as state statutes in interpreting the expression
in the bankruptcy act.   Moreover, while a state statute like that
of California or of Missouri would be binding on a federal court
in a common-law action brought by a creditor or a subsequent
purchaser in good faith against a fraudulent vendee, it would
not be binding in a common-law action brought by an assignee
in bankruptcy against such a vendee, except on the assumption
that congress by the expression "in fraud of his creditors,"
meant to include constructive frauds, or on the assumption that
the fraud against creditors proved under the California statute,
or held to be such under the Missouri statute, is not distinguish-
able from actual fraud, with either of which assumptions we are
satisfied.   Of course, the state legislatures, in passing the stat-
utes in question, intended only to provide that fraud should be
proved by certain circumstances or should be held to exist
under certain circumstances, but did not undertake to define the
meaning which the expression, "in fraud of his creditors," in
the bankruptcy act, should in those states be construed to have.
If the court had thought that congress meant actual fraud, and
that a constructive fraud is not necessarily an actual fraud,
there is nothing in *s.* 721 to bind a federal court to accept the
state statute as applicable.   It is plain, both from these consider-
ations and from a reading of the decisions cited, that the state
statutes were followed in the same way that decisions of the
state courts are commonly followed by the federal courts in
cases in which those courts have jurisdiction only on account of
citizenship of parties.

The only difference between actual and constructive fraud is
in the mode of proof.   Fraud is fraud, however it be proved.

Neither the court nor the jury ever know whether a transaction is actually fraudulent or not; they know only the evidence and what is to be inferred from it. When actual fraud is said to be proved, the meaning is that facts are shown from which the inference of fraud follows in an ordinary course of reasoning; when constructive fraud is said to be proved, the meaning is that facts are shown from which the court, for reasons of public policy, on account of the probability that fraud exists and the difficulty of proving it .in such cases, or on account of injustice that will be done if a transaction is upheld, requires the jury to find that the transaction was fraudulent. Is it reasonable that in those cases in which fraud cannot be shown except as a legal inference from facts that are not logically complete proof of it, however suspicious they may be, the transaction should be avoidable in a suitable proceeding brought by a single creditor, if insolvency proceedings do not interfere; but an assignment by the debtor will preclude the creditors from asserting their rights in any form, either collectively through the assignee or individually by means of attachments? It is so, if the statute clearly makes it so ; but such a construction of the statute is not to be adopted if a more reasonable one is possible. It may be so with a mere lack of record, which is not in this state understood to be fraudulent as to creditors, though allowing them to gain a priority under an express provision of the statute. But a mere lack of record is cured by so slender a thing as notice to a creditor before his attachment is made, though it may be long after the credit was given ; which clearly discriminates between it and fraud, actual or constructive.

If there is any difference between evidence that a statute requires the court to be satisfied with in particular cases and evidence that the court is satisfied with in such cases independently of a statute, it seems clear that it is the latter which another court, not directly bound by the statute or decisions, should have the least hesitancy in adopting in different but analogous cases. In the present case, however, it is not the question whether another court, a court of the United States, should adopt the same presumption that is adopted by this court; the question is whether this court for one purpose will regard certain evidence as conclusively proving a certain fact, and for another like purpose, with the same reasons existing, will regard such evidence as inconclusive. The bankruptcy cases, therefore, go much farther than is necessary for the decision of this case in accordance with our contention.

In *Badger* v. *Story*, 16 N. H. 168, the conclusion of the court is (*p.* 177): " If the conveyance was intended to defraud creditors, and a subsequent creditor from the bankrupt before the bankruptcy could have avoided it, perhaps the assignee may.

But if there was no actual fraud, there seems to be no propriety in permitting the assignee to avoid entirely what the bankrupt could not have avoided." This opinion was not published till nineteen years after the decision was rendered. The word "creditor" (following "subsequent") is probably a mistake for *purchaser*, as appears from the context. But whichever word is taken it is to be observed that even an actual intention to defraud creditors was not thought to permit an assignee to avoid a conveyance unless still another condition was satisfied, and even then the court was in doubt whether it did. The opinion of the court will be seen to depend partly upon the language of the bankrupt act of 1841 and partly upon an analogy with the rules as to the avoidance of a fraudulent deed by an administrator; and the doubt which is expressed as to the right of an administrator to avoid a fraudulent deed, while it is limited in expression to the case of no actual fraud, rests on reasoning which is equally applicable to a case of actual fraud. The fact that the administrator or the assignee represents all classes of creditors and that any surplus will go to the heirs or to the bankrupt, is specially dwelt upon, and the court is more afraid of giving some creditor what he could not have obtained by an attachment than of depriving another creditor of what he could have obtained and perhaps actually had obtained by an attachment. As for the chance that there might be a surplus for the heirs or the bankrupt, while it cannot be denied that it is possible, it must be so rare that it is fantastic to found a rule upon it. Such a case, moreover, presents no more difficulty than a case where a creditor attaches and levies upon property more than sufficient to pay his debt, and no other creditor proceeds against the surplus, and it should be determined upon the same principles.

In *Abbott* v. *Tenney*, 18 N. H. 109, it was decided that an administrator may avoid a constructively fraudulent conveyance, but only so far as he needs the property, the grantee being entitled to the surplus, and this decision was followed in *Marsh* v. *Fuller*, 18 N. H. 360. In *Stratton* v. *Putney*, 63 N. H. 577, it was decided that an absolute conveyance, intended merely as security, without actual fraud, is constructively fraudulent as to subsequent creditors, and this decision may be regarded as applicable to any case where the constructive fraud consists of a secret trust, and probably to any kind of constructive fraud. These authorities leave absolutely nothing of *Badger* v. *Story*, unless it is the language of the bankruptcy act. The bankruptcy act of 1841 contains no such passage as that we have quoted from the bankruptcy act of 1867. If the decision of *Badger* v. *Story* is correct, it is because of this difference between the two acts. The case is not an authority upon the act of 1867 or upon our own in-

solvency statutes. So far as any arguments contained in it apply to the act of 1867 or to our insolvency statutes, the decision is completely discredited by the United States cases and by the New Hampshire cases just cited.

In addition to these considerations, tending to show that fraud is proved by the circumstances existing in this case, so far as any question relating to the disposition of the case is concerned, we submit that the expression "fraudulent as to creditors" had, long before the passage of the insolvency act, acquired a fixed meaning, by which it includes conveyances attended with a secret trust, whether fraudulent in fact or not; and that the legislature must be supposed to have used it in that sense. If such conveyances had not been held to be fraudulent as to creditors till after the passage of the insolvency act, it would have been inconsistent and absurd to hold that the same proof that would suffice in the case of an attaching creditor would not suffice in the case of an assignee in insolvency; but it would be still worse to so hold as a construction of language already fixed in a different meaning before it was used in the statute.

It is not admitted by the plaintiff that everything which was done was done in good faith. No explanation was offered of the giving of the security by means of a sale and a lease back and agreement to reconvey, although the defendant was asked by the plaintiff's counsel if he had any explanation to offer; and we are not bound to know and do not know whether it was done with an idea that it would dispense with the formality of foreclosure, or in order to dispense with a record and the publicity and injury to credit that might have been caused thereby. In the latter case, it would be fraudulent in legal contemplation, though not a fraud of the kind that would necessarily discredit a man engaged in it. The statement in the reserved case that "it was not claimed that there was any fraud in fact in the transaction," means merely that it was not contended that fraud was shown by the evidence, except in the existence of a secret trust and the inference to be drawn from that circumstance. That is true; but no admission whatever was made.

The fact that the physical position of the property was such that it would have become a part of the realty if by a valid sale it had become the property of the owner of the realty, seems to us of little significance. If the defendant acquired no valid title to the property, it is of no consequence whether his title, if valid, would have been to it as realty or as personalty. It may have some bearing as explaining the lack of change of possession, but we do not think the court will accept that as a valid excuse for leaving the vendors in the apparent possession exactly as before the transaction. *Sanborn* v. *Putnam,* 61 N. H. 506. A lack of change of possession is at the most only evi-

dence of a secret trust, and in this case the secret trust is admitted.

*Jewett & Plumer, Jewell, Stone, Owen & Martin,* and *Isaac W. Smith,* for the defendant.

CARPENTER, C. J. In *Coburn* v. *Pickering,* 3 N. H. 415, it was held that any trust in favor of the vendor in a sale of chattels is a fraud with respect to creditors; that possession of the chattels retained by the vendor is always *prima facie,* and, if unexplained, conclusive evidence of a secret trust; and that when the fact appears that there was a trust, fraud is an inference of law, which the court is bound to pronounce in favor of judgment creditors. The doctrine of that case has been applied in numerous cases in this state, and it may be regarded as too firmly established in our jurisprudence to be reversed by judicial action. "It is unnecessary to cite authorities to the point that a sale of chattels is invalid as to creditors of the vendor when the property is allowed to remain in his use and possession." *Doucet* v. *Richardson,* 67 N. H. 186, 187. Though it is found or admitted that the vendee paid to the vendor the full value of the property, that no actual fraud was intended or committed, and that no creditor was misled, deceived, or injured in any respect by the transaction, the law pronounces it fraudulent and void. It is declared a fraud in law "without any particular reference to its effect upon existing or subsequent creditors." *Kendall* v. *Fitts,* 22 N. H. 1, 7. It is a fraud though "neither the dictionary nor morality would give it that name" (1 Par. Cont. 281); and a creditor by legal process may seize the property for which the innocent vendee has paid an adequate consideration and apply it in satisfaction of his debt. Neither the good faith of the parties, nor the entire absence of injury or inconvenience to others on account of the sale, is material. Indeed, if it could be shown that the insolvent debtor's attachable estate was increased in value by reason of his prudence, shrewdness, or good fortune in making the trade with the vendee, the evidence would be inadmissible; the vendee would still be deprived of his property, and both the debtor and his creditor would be benefited thereby,— the debtor by the liquidation of his indebtedness, and the creditor by the collection of his claim.

To one not profoundly versed in the science of law, the rule that in all cases the vendor's retention for his use of the possession of the chattels sold raises a conclusive presumption of fraud, to be declared by the court as a matter of law, would seem to afford a convenient and effective method by which creditors may accomplish a practical fraud upon innocent third parties. A

strenuous effort to guard the interests of attaching creditors, announced as a rule of law, has resulted in depriving innocent purchasers of their property without a return of the purchase price. For no actual fault on their part they are often doubly punished, being compelled to sacrifice the consideration they paid for the property as well as the property itself. The reason assigned for this conclusive presumption of fraud, arising as a matter of law from the debtor's unexplained possession of the chattels, is that such a sale is void, not because any wrong in fact has been perpetrated,— not because the creditors have been injured in the slightest degree or have been actually hindered or delayed in the collection of their debts by the debtor's conditioned sale of the property,— but because the form of the sale is such as might be convenient for perpetrating a fraud upon the debtor's creditors. Such sales "would afford a cover for innumerable frauds against creditors, if they were by law compelled to unravel each transaction and show actual fraud. It would rarely be in their power to do this in the most fraudulent cases. All would be contrived originally by the parties to the fraud to meet the attack; and the fraud would be carefully covered by fortresses impregnable by any evidence which it would be in the power of creditors to bring against them." *Coburn* v. *Pickering*, 3 N. H. 415, 428. "The reason why the law denounces as wanting in good faith and fraudulent, a bill of sale purporting an absolute conveyance of property but attended with a secret trust, is that it holds out false colors; that it is evidence to prove the contract to be different from what it is in reality, and is calculated to deceive and mislead creditors and may be used for that purpose. And the law presumes that he who buys goods of a person in debt, and takes evidence of the contract which is in its nature false, intends to use it for the purpose of deception, and to defeat that purpose declares the contract to be void for that cause." *Parker* v. *Pattee*, 4 N. H. 176, 178. "It is because such trusts are calculated to deceive and embarrass creditors, because they are not things to which honest debtors can have any occasion to resort in sales of their property, and because they are the means which dishonest debtors commonly and ordinarily use to cheat their creditors, that the law does not permit a debtor to say that he used them for an honest purpose in any case." *Winkley* v. *Hill*, 9 N. H. 31, 33. In effect, the argument is that insolvent debtors may sometimes resort to this method of disposing of their property in order to place it beyond the reach of their creditors; hence, the law pronounces all such sales void in favor of attaching creditors.

If from the nature of the transaction it necessarily followed that the debtor's purpose was fraudulent, and that the vendee engaged to assist him in carrying it out, the legal conclusion or con-

clusive presumption that the conveyance was fraudulent and void would be supported by sound logic. It would not then be the finding of the fact of intention from evidence reasonably susceptible of more than one explanation. But if it is conceded that the debtor may retain the possession and use of property which he has sold without intending to delay or hinder his creditors, a presumption of law, or a binding charge by the court to the jury, that he did so intend and that the conveyance is therefore void, would seem to be an invasion of the province of the jury. The presumption, though called one of law, is essentially one of fact. Formerly it was held that from the recent unexplained possession of stolen property the law presumed that the possessor was the thief, and the burden of proof was thereby shifted upon the respondent. But in *State* v. *Hodge*, 50 N. H. 510, this doctrine was repudiated on the ground that the inference or presumption was one of fact for the jury,— not of law for the court. The possession of stolen property may be evidence that the respondent stole it, as the possession by the vendor of the goods sold may be evidence that he had a purpose to conceal them from his creditors; but as the possession of property recently stolen is not inconsistent with innocence on the part of the possessor, and as the vendor's possession and use of the subject of the sale may not be tainted with the least bad faith on his part, the inference to be drawn therefrom is one of fact; and nothing less than legislative action could make it a rule of law. Because it is a question of fact, its determination as a question of law has often resulted in the most evident injustice. If the debtor sells his horse for a hundred dollars, retaining the use and possession of it for a month, and with the money buys another horse of equal or greater value, no sound reason can be suggested why the security which his creditors may obtain should be doubled in consequence of the transaction. As a matter of fact they are not injured; why, as a matter of law, should it be held that they are defrauded? "Existing creditors may of course challenge the good faith of the transaction; but if they cannot disturb an absolute sale when made in good faith, why should they be permitted to challenge a conditional sale if made in like good faith? The fact that fraudulent relations are possible is hardly a sufficient reason for denouncing transactions which are not fraudulent. So, if the question were open, or a new one unaffected by any settled law of the state, we incline to the opinion that the question is not one of law so much as it is one of fact and good faith." *Etheridge* v. *Sperry*, 139 U. S. 266, 278. "The law will declare any instrument which contains provisions that are not reconcilable with an honest or legal interest to be void upon its face, because no evidence can change its character. But in all other cases where property is transferred with the alleged

intent of hindering or defrauding creditors, this intent cannot be conclusively assumed by the law, but must be determined by the jury upon all the circumstances of the case." 1 Sm. L. C. (6th Am. ed.) 35. "Cases may present themselves where the form of the conveyance and the stipulations of the contracting parties are of such obviously illegal character and purpose, that it may be the duty of the court to pronounce them fraudulent in law, and wholly ineffectual; but in general, whenever the terms and stipulations of a contract are by possibility compatible with good faith, and have upon the face of them the essential elements of a legal contract, the question of fraudulent intent and want of good faith in a contract for the sale of property is to be submitted to the jury." *Jones* v. *Huggeford*, 3 Met. 515, 517.

The fundamental difficulty with decisions holding that "the nature of the benefit reserved in the sale is immaterial," and that any "favor to be shown by the vendee" is a fraud in law (*Coburn* v. *Pickering, supra*), may be discovered when the distinction between law and fact is carefully observed. In cases of this character the plaintiff asserts, in substance, that the contract of sale has operated as a fraud upon him by depriving him of the power to appropriate the specific property conveyed, in payment of his adjudicated claim against his debtor. In the language of the statute of Elizabeth, he claims that the sale was "devised and contrived of malice, fraud, covin, collusion, or guile, to the end, purpose, and intent to delay, hinder, or defraud creditors." 13 Eliz., c. 5. But instead of proving his case and sustaining the burden he assumes, he finds it is only necessary to ask the judge to rule as a matter of law that the debtor's possession and use of the property sold conclusively proves "the malice, fraud, covin, collusion, or guile" necessary to defeat the sale. This rule, erroneously called a presumption of law, compels the judge to hold in very many cases that the sale was fraudulent when it is plainly apparent that it was attended with the utmost good faith toward the vendor's creditors. It becomes the means, in perhaps a majority of cases where it is applied, of depriving innocent parties of their property bought at a *bona fide* sale thereof. Although the evidence before the jury is uncontradicted that the sale was not only fair but made in the interest of the vendor's creditors, they are instructed that they must negative that fact by a presumption announced by the court as a principle of substantive law. That mischief has resulted from such a palpable conversion of a question of fact into one of law is not surprising. If it is conceded that the actual purpose of the vendor is not important, but only the effect of the transaction upon the rights of creditors is to be considered, it is manifest that the question is still one of fact. To hold that the vendor's temporary use of the property is under all circumstances prejudicial to the rights of creditors,

is an illogical conclusion which finds no support in the ordinary experience of men. It may, or it may not, be the means of concealing the debtor's property from his creditors; and whether or not it has that effect must depend upon the circumstances of each case, which necessarily differ in variety and importance from those of every other case. Hence the question presented should be one of fact for the jury, and not one of law for the court.

It is somewhat remarkable that the statute of Elizabeth (13 Eliz., c. 5), which is a highly penal statute, should have been construed as giving authority to the court to pronounce as fraudulent and void, sales of personal property which are admittedly honest and advantageous to the vendor and his creditors. The language of the act does not indicate such a purpose, and no considerations of public policy demand or require such a construction. "It makes one shudder to think that persons who appear, like the defendants, to have acted most honestly should have been in any hazard of being subjected to punishment for having endeavored to procure an equal distribution of their debtor's effects among all his creditors." *Grose*, J., in *Meux* v. *Howell*, 4 East 1, 15. It would seem that an intention to delay and hinder creditors by a pretended sale or transfer of property was a material fact to be proved in a prosecution under the statute. It did not declare that the vendor's possession of property sold, if unexplained, or his retention of any benefit to be derived from the use of the property, should make the sale void and subject the parties to a heavy penalty. *Hughes* v. *Cory*, 20 Ia. 399, 402. But by judicial construction amounting to legislation, such a meaning has been given to it. "But then such a construction is not to be made in support of creditors as will make third persons sufferers. Therefore, the statute does not militate against any transaction *bona fide*, and where there is no imagination of fraud." *Cadogan* v. *Kennett*, Cowp. 432, 434. It may be open to serious doubt whether the fraud found to exist in *Twyne's Case*, 3 Co. 80, was declared to exist as a matter of law, and this is regarded as a leading case upon the subject of fraudulent sales. With reference to that case, it is material to note that the trial was upon an information in the star chamber before the judges who were to pass upon the facts as well as the law; and it was not important to draw distinctions between the province of the court and that of the jury. Moreover, the entire argument seems to have been intended to prove that Twyne was guilty of actual fraud, and he "was convicted of fraud, and he and all the others of riot." It is not to be supposed that such a result would have been reached in a prosecution against respondents entirely innocent of any sinister purpose, unless it is sound law that criminal intent is to be found by the court as a question of law — a conclusion long since repudiated. *State* v. *Bartlett*, 43 N. H. 224; *State* v. *Pike*, 49 N. H.

399, 431. One badge of fraud discovered in that case was the statement in the deed that it was made " honestly, truly, and *bona fide*," but it was not the purpose of the court to lay it down as a rule of law applicable to all cases that a declaration, by the parties to a sale, of their honesty, was conclusive evidence of their dishonesty. It was a fact which the court thought had some tendency to prove such a purpose, but like the other " badges of fraud " mentioned in the case it did not necessarily preclude explanatory evidence of good faith. A careful examination of the decision in *Twyne's Case* would undoubtedly show either that a conclusion of fact was stated as a proposition of law, or that there was no intention to annunciate a legal doctrine at variance with the manifest purpose of the statute of Elizabeth. It would also appear that subsequent cases professedly following that case (including *Coburn* v. *Pickering*, *supra*) have failed to consider the evident purpose of the statute in explanation of the meaning of that decision, and have been led to regard as settled law the statement of evidentiary facts.

It is not often that the law results in palpable injustice and wrong. Its purpose is the accomplishment of justice. If, in its practical application, it as often produces wrong as it promotes right, a critical examination of its history and development is demanded for the discovery and correction of the error; for in such a case it is safe to assume that error in some form and at some stage of its growth has distorted the law and deprived it of some essential attribute. To hold that under no circumstances can a vendor retain the possession and use of the subject of the sale, with the assent of the vendee, is to state a proposition of law which, in a majority of cases where it is applied, results in gross injustice to innocent vendees. The purpose of the law is not attained. " In my long experience I have had occasion to observe the mischievous operation of the rule; for, under its application, I have found myself compelled, as a judge, to pronounce transactions to be fraudulent and void as to creditors, which were known to be perfectly fair and *bona fide*, and were not intended or calculated to delay, hinder, or defraud creditors." *Cabell*, P., in *Davis* v. *Turner*, 4 Grat. 422, 470. Manifestly, a rule of law, though adhered to for years, which is so repugnant to natural justice, ought not to be extended beyond the bounds indicated by former decisions. *Albee* v. *Webster*, 16 N. H. 362, 371, 372. Fraudulent sales within the principle now under consideration are only voidable at the election of the the vendor's judgment creditors. As between the parties and their representatives, they are valid. The title passes to the vendee and is good against a subsequent *bona fide* purchaser of the vendor who retains possession. *Stevens* v. *Morse*, 47 N. H. 532, 535; *Quimby* v. *Williams*, 67 N. H. 489, 493. Such sales are valid against the claims

of all the creditors of the vendor, except those only who by attachment or levy seize the identical property conveyed. *Jones* v. *Bryant*, 13 N. H. 53; *Hill* v. *Bank*, 45 N. H. 300, 310; *Heywood* v. *Brooks*, 47 N. H. 231, 234; *Leavitt* v. *Leavitt*, 47 N. H. 329, 333, 334; *Ritchie* v. *Glover*, 56 N. H. 510, 511; *Owen* v. *Dixon*, 17 Conn. 492, 498.

While an administrator, as the representative of the creditors, may cause the intestate's fraudulent conveyance to be set aside (*Kingsbury* v. *Wild*, 3 N. H. 30; *Janvrin* v. *Curtis*, 63 N. H. 312), it is believed that his remedy in this respect has been confined to cases where the creditors defrauded would otherwise suffer actual loss. If the intestate has sold personal property for a full consideration, by a sale unimpeachable except for his retention of the possession, the administrator, however insolvent the estate may be, cannot appropriate the property to the payment of the debts, but on the contrary is bound to deliver them to the vendee; for the creditors of the estate have been in no wise injured by the transaction. " In the case now before us a full consideration was paid to Edson, by means of which his estate was benefited to that amount; and it is the same thing as if it had been paid to his administrator. It is not to be presumed that the intestate has wasted his estate, but rather that the consideration paid has gone to increase his assets. If we were to decree against the defendant, it would in effect give the estate the benefit of receiving a second time the full value of this property and inflict a penalty upon the defendant. This would be inequitable, and is a sufficient reason why chancery will not lend its aid to the administrator." *Allen* v. *Mower*, 17 Vt. 61, 68. If the deceased has conveyed his property to a stranger without receiving an equivalent for it, the inference might be irresistible that he had diminished his assets to that extent and, in effect, defrauded his creditors. *Abbott* v. *Tenney*, 18 N. H. 109; *Cross* v. *Brown*, 51 N. H. 486; *Preston* v. *Cutter*, 64 N. H. 461, 469. But if it does not appear that the assets in the hands of the administrator were diminished by the transaction,— ordinarily a question of fact,— justice would not require him to institute proceedings to set it aside. Substantially all the property of the estate is vested in him for the benefit of the creditors, and no creditor can insist that any specific property shall be appropriated to the payment of his debt (P. S., c. 191, s. 7), as he might have done by an attachment and levy during the lifetime of the deceased. Hence the only ground on which he can insist that the administrator shall repudiate the deceased's conveyance is that the assets of the estate for the payment of the debts have been materially decreased thereby. If that is not the fact, it would be difficult to suggest a reason why an innocent vendee of the deceased, who for a proper purpose allowed the goods to

remain in the latter's possession, should be compelled to contribute to the enrichment of the estate.   *Badger* v. *Story*, 16 N. H. 168, 174.

In foreign attachment it has been held that the doctrine of *Coburn* v. *Pickering*, so far as it authorizes a conclusive, legal presumption of fraud contrary to the fact, is not applicable. In *Boardman* v. *Cushing*, 12 N. H. 105, 112, 113, 114, the court say : " We are of opinion that the broad principle of *Coburn* v. *Pickering*, and other cases cited, however proper it may be in the case of attachment, . . . cannot be applied in a suit where the party who contests the sale as fraudulent summons the vendee as a trustee of the vendor, and has an opportunity, if he sees fit, to examine him on oath relative to the terms, conditions, and circumstances attending the sale. . . . If placing upon the record an absolute conveyance of the seven sixteenths of the ship might have a tendency to mislead creditors, and if it might therefore be objectionable on that account in case the ship had been attached, in which case no evidence could have been derived from the vendees, in a suit by them to recover the property,— it may be true, notwithstanding, that this conveyance was taken with no design to defraud, but on a supposition that it would more effectually secure their rights.   This form of process is regarded as an equitable action ; and it would not consist with equity to deprive the party of a mortgage security by reason of a mere mistake in the mode of taking it."   This is an unequivocal recognition of the rights of creditors to set aside a presumptively fraudulent conveyance upon an attachment of the property, but the opinion also contains the equally emphatic assertion that the enforcement of such rights, without regard to the actual intention of the parties or the resulting injury, is not to be extended to cases requiring the application of equitable principles.   To charge a trustee in foreign attachment on account of a fraudulent sale of property, fraud must be proved as a fact from all the relevant circumstances of the case ; and not declared as a matter of law from a few circumstances which as evidence might indicate a fraudulent purpose.   *Hutchins* v. *Sprague*, 4 N. H. 469 ; *Pittsfield Bank* v. *Clough*, 43 N. H. 178 ; *Heywood* v. *Brooks*, 47 N. H. 231 ; *Gutterson* v. *Morse*, 58 N. H. 529 ; *Robinson* v. *Mitchell*, 62 N. H. 529.

The doctrine of fraud conclusively presumed to exist in the sale of personal property, when the vendor retains the possession and use of it, has been confined to cases of the litigation of the title between the vendee and a creditor of the vendor, who has levied upon the identical property as the property of the vendor. There has been little disposition to extend its operation to other cases involving the interests of creditors.   In *Clark* v. *Morse*, 10 N. H. 236, 239, the court, referring to the rule announced in

*Coburn* v. *Pickering*, say that it may, "in some instances, have operated to the loss of a purchaser, who had actually paid a full consideration for property which he had incautiously left in the possession of the vendor; but we are satisfied that it is sustained on sufficient authority, and that its general operation is salutary in preserving good faith in sales of personal property, and in preventing litigation upon questions which would otherwise arise respecting sales of that character unaccompanied with possession.   But while we adhere to that decision, we have no disposition to extend the principle of that case, so that a vendee can never safely permit the vendor to have the possession and use of the property after he has parted with the title."   In other words, the mischief resulting from the rule was a reason for its non-extension; and this declaration of the duty of the court has hitherto been strictly observed.   The doctrine of *Coburn* v. *Pickering* never has been extended either in its scope, or application. It has been confined strictly within its original limits, and an examination of the cases in which it has been applied shows that it ought not to be extended.   In more than one half of them it is either expressly found or distinctly appears that there was no fraud in fact, and that no creditor was injured or in any way misled by the transaction.   *Parker* v. *Pattee*, 4 N. H. 176; *Paul* v. *Crooker*, 8 N. H. 288; *Towle* v. *Hoit*, 14 N. H. 61; *Ladd* v. *Wiggin*, 35 N. H. 421; *Pinkerton* v. *Railroad*, 42 N. H. 424; *Shaw* v. *Thompson*, 43 N. H. 130; *Lang* v. *Stockwell*, 55 N. H. 561; *Cutting* v. *Jackson*, 56 N. H. 253; *Plaisted* v. *Holmes*, 58 N. H. 293; *Flagg* v. *Pierce*, 58 N. H. 348; *Parker* v. *Marvell*, 60 N. H. 30.   The vendee's property in these cases was seized and applied in satisfaction of the vendor's debt, not by reason of any actual fraud or wrongdoing on his part, not because the vendor had any purpose to conceal his property from his creditors, but because by an innocent and perfectly harmless mistake they became subject to the operation of a rule of law designed to prevent fraudulent transfers of property.   A rule of law established by decision which produces more mischief than it prevents, if not overruled, should not, by analogy, be applied to cases easily distinguished from the authorities which have announced and established the rule.   If it has nothing but the force of authority to sustain it, justice does not require its unnecessary extension; and if it has become established as a rule of property and cannot be abrogated except by legislation (*Bellows* v. *Parsons*, 13 N. H. 256, 261; 1 Kent *476), it should be kept within the bounds indicated by the precedents.

It is unnecessary to decide whether the decision announced in *Coburn* v. *Pickering* and followed in numerous cases during the last seventy years can be overruled.   The question to be determined is whether the legislature, by the language used in the

insolvency law (P. S., c. 201, s. 26), intended to give the assignee the same power to avoid a sale by the debtor, on account of fraud presumed by law contrary to the fact, that a creditor acquires by attachment and levy. The words of the statute are that "all pledges, payments, mortgages, sales, and transfers, whenever made, if fraudulent as to creditors, shall be void." The meaning of the words "fraudulent as to creditors" is not free from doubt. Do they refer to transactions that are held to be fraudulent as a matter of law, though they may result in no damage to a single creditor, as well as to transactions that are tainted with actual fraud and that produce actual loss or damage? No one would doubt that the language used is sufficient to include sales that operate as a fraud in fact upon creditors; and that is the meaning men in general would attach to them. They are not technical words and do not appear to have been used in a technical sense. No reason is suggested why they should have one meaning in law and another meaning in ordinary speech. With rare exceptions, this phrase when it occurs in law books relates to fraud in fact, unless the context indicates a different meaning. In the chapter relating to insolvency proceedings (P. S., c. 201), it is provided that "the judge may summon any person suspected of having fraudulently received, concealed, embezzled, or conveyed away any of the estate of the debtor . . . to appear and submit to an examination" (s. 27); that the debtor shall make oath that he has not disposed of any of his property in order to defraud his creditors (s. 34); that "debts created by the debtor's fraud . . . shall not be discharged" (s. 37); that a discharge shall |not be granted "if he has fraudulently concealed any part of his estate, . . . or has made any fraudulent payment, gift, transfer, conveyance, or assignment of any part of his property" (s. 40); and that the president of a corporation in insolvency, or other proper officer, shall make oath that no part of the estate has been "disposed of in any manner in fraud of the laws relating to insolvency or of the creditors of the corporation" (s. 49). Questions of fraud arising under these sections, it is safe to assume, would not be determined by presumptions of law inconsistent with the proven or admitted facts. A transfer of property which might be evidence of fraud would not be declared to be such in the face of a reasonable explanation. And if the words "fraud," "defraud," "fraudulent," and "fraudulently," as used in these sections, relate to actual fraud alone, it would be difficult to explain why the legislature in another section of the same chapter used the word "fraudulent" to include fraud in law. If that had been the legislative purpose, some unequivocal indication of it would be expected.

The claim is advanced that the expression "fraudulent as to

creditors " has acquired in law a " peculiar and appropriate meaning " (P. S., c. 2, s. 2) which the court must adopt in giving it a construction; and the " peculiar and appropriate meaning," it is said, is that it relates to harmless sales of property which creditors may set aside as fraudulent in law, as well as to sales that are fraudulent in fact. But the argument proves too much; for if the expression is to be construed in view of the doctrine of *Coburn* v. *Pickering* and the cases based upon that authority, it should read " fraudulent as to attaching creditors who have obtained a lien upon the property." If there are no creditors of that description, this clause would have no application in the case of an assignment in insolvency. If the legislature merely desired to preserve the rights of creditors as defined in cases relating to their title obtained by a levy on property fraudulently conveyed,— if that is the meaning of the statute,— the language used must be qualified as above suggested, and only judgment creditors who have obtained a lien on the property are protected by the statute.

" If a plaintiff seeks relief in equity in regard to personal estate, he must show an execution giving him a lien on the goods and chattels, which he has pursued to every available extent at law before he can resort to equity for relief." *Dodge* v. *Griswold*, 8 N. H. 425, 427. " The general principle deducible from the authorities applicable to this case, is that where property is subject to execution, and a creditor seeks to have a fraudulent conveyance or obstruction to a levy or sale removed, he may file a bill as soon as he has obtained a specific lien upon the property, whether the lien be obtained by attachment, judgment, or the issuing of an execution. But if the property is not subject to levy or sale, or if the creditor has obtained no lien, he must show his remedy at law exhausted, by an actual return upon his execution that no goods or estate can be found (which is pursuing his remedy at law to every available extent), before he can file a bill to reach the equitable property of the debtor." *Tappan* v. *Evans*, 11 N. H. 311, 327.

A sale " fraudulent as to creditors " is not fraudulent as to all creditors. It cannot be attacked or set aside by a creditor who has done nothing toward securing his claim. As to him it is not fraudulent. The mere sale of property attended with a secret trust in favor of the vendor does not alone show that his creditors have been defrauded, or that they have been hindered or obstructed in the collection of their debts. An unsuccessful attempt to make the collection by legal process must be shown before it can be said that the sale was " fraudulent as to creditors." In other words, it was fraudulent only as to such creditors as failed to secure their debts by legal process. Hence, some of the debtor's creditors may be defrauded by the transac-

tion, while others are held in law to have suffered no injury. The former class can prove a case of fraud, the latter cannot.

Upon a creditor's bill (P. S., c. 205, s. 7) it is necessary for him to show that an "execution has been issued and returned unsatisfied" before he can have the assistance of equitable procedure to reach property "conveyed by the debtor in fraud of his creditors." If he does not prove that an unsatisfied execution has been returned, he is not one of the creditors who has been defrauded by the debtor's conveyance, though attended by a "secret trust." The conveyance is not fraudulent as to him. But the assignee in this case, representing all the creditors, none of whom have prosecuted their claims to judgment, insists, in effect, that he is entitled to prosecute a creditor's bill without complying with statutory provisions which are essential in proceedings of that character. The creditors whom he represents could not have successfully taken that position before the insolvency proceedings were begun. Why should they be granted that indulgence through the medium of their representative or trustee ? He is entitled to set aside sales of the debtor that are "fraudulent as to creditors," that is, the debtor's creditors.

But if that expression is to be regarded as a technical phrase which has "acquired a peculiar and appropriate meaning in law," it is plain that it relates to a fraud, either in fact or in law, upon judgment creditors. But such a construction would render that expression in the insolvency law practically meaningless, since it would be an extremely exceptional case in which the assignee could even attack a conveyance which was fraudulent in fact. The provision in the insolvency law that sales "fraudulent as to creditors" are void can only be used in its popular meaning, which authorizes the assignee to set them aside without regard to the question whether the creditors, or any of them, might have appropriated the property conveyed, at the date of the assignment. It is to be presumed that the legislature intended to confer some power upon assignees in such cases. The technical construction, if carried to its logical result, deprives the statute of any practical effect; while the natural and usual construction attached to the language by men in general makes it a potent means of frustrating and defeating sales and conveyances which were designedly intended to cheat and defraud the debtor's creditors, or which necessarily have that effect.

If the word "fraudulent" has acquired a peculiar meaning, the word "creditors," for the same reason, cannot be used in its popular sense. Decisions which have declared an act to be a fraud, which in ordinary language would be called an honest sale, have also declared that only judgment creditors of the vendor shall be allowed to say that they were defrauded by the

harmless act. To hold that an assignee in insolvency under our statute may set aside his debtor's honest sales of property, which result in no diminution of the estate, because under other circumstances they might be deemed fraudulent in law as to certain creditors, would be to extend the doctrine of *Coburn* v. *Pickering* in favor of all the creditors, and to give a novel and unnecessary meaning to the language of the statute. The expression "fraudulent as to creditors" would receive neither its "peculiar and appropriate meaning," as defined by the authorities, nor its ordinary and natural meaning, as interpreted by men in general. It is, therefore, apparent that this method of construction cannot be adopted. The legislative purpose is not ascertained from evidence so doubtful and ambiguous.

The language of the statute is to be understood in its popular and usual sense, and when so construed it results in no injustice and does not compel the court to denounce as fraudulent and void transactions that are on all theories of morality honest and valid. It has been regarded as a useful rule that when a statute is capable of two constructions, one of which leads to absurd, irrational, or unjust results, and the other to reasonable and just results, the latter is to be adopted as an expression of the legislative intention. *Smith* v. *Burley*, 9 N. H. 423, 427; *Atherton* v. *McQuesten*, 46 N. H. 205, 211, 212; *Telephone Co.* v. *State*, 63 N. H. 167, 168, 169; *Opinion of the Justices*, 66 N. H. 629, 650, 651, 658, 659; *Middlebrook* v. *French*, 4 Conn. 1; *Church* v. *United States*, 143 U. S. 457, 459–461; *Perry* v. *Skinner*, 2 M. & W. 471; *Camp* v. *Rogers*, 44 Conn. 291; *People* v. *Jaehne*, 103 N. Y. 182, 197. In such a case the court is bound to presume as a matter of reasonable evidence that the statute was not intended to subject an innocent person to loss or injury, either in his person or property.

It is insisted that since the object of the insolvency law is the equitable distribution of the debtor's property among his creditors, and since only such attachments in suits against the debtor are dissolved by insolvency proceedings as exist upon property that passes to the assignee, a creditor attaching property sold under a sale fraudulent in law would be a preferred creditor, and that the question of his preference would depend only upon his diligence and expedition in securing the attachment; and it is argued that the legislature could not have intended such a result. But this argument has little legitimate bearing upon the question. The great weight of the competent evidence shows that it was not the purpose of the legislature to distribute among the debtor's creditors property which an innocent stranger had honestly bought and paid for. To say that the creditor in the case supposed is a preferred creditor is not accurate. He does not acquire a preference to the assets belong-

ing to the debtor's estate, but merely a right to insist upon his legal title to property belonging to a third party in satisfaction of his claim. Such an advantage is no more a preference, prohibited by the insolvency statutes, than is a creditor's attachment and levy upon land conveyed by the debtor under an unrecorded deed of which the plaintiff has no notice. In such a case the land does not pass to the subsequent assignee in insolvency (*Smythe* v. *Sprague*, 149 Mass. 310; *Low* v. *Welch*, 139 Mass. 33; *Adams* v. *Lee*, 64 N. H. 421), though a sufficiently active creditor without notice may appropriate it in satisfaction of his debt and thereby obtain an advantage which other creditors of the same class cannot secure. Why should a rule of law announced by the court, that honest conveyances of property attended by a trust in favor of the debtor shall be void as against judgment creditors, give an assignee in insolvency any greater rights to the property than a rule of law enacted by the legislature, that an unrecorded deed shall not be valid " against any person but the grantor and his heirs only " (P. S., c. 137, s. 4) ? The aliened property in either case does not belong to the debtor's estate, and if an attaching creditor may obtain a lien upon it by force of a recognized legal right, it cannot be claimed that the purpose of an equitable distribution of the debtor's property under the insolvency law is defeated. " The satisfaction of a creditor's demand against an insolvent debtor by the operation of the law of this state . . . or of any other state, without the debtor's co-operation or consent, cannot be a wrongful preference or payment. The exercise of a right which the law gives cannot be unlawful." *Thompson* v. *Tetley*, 68 N. H. 481, 482.

Cases that hold that an assignee in insolvency may appropriate property which the debtor has conveyed for a full consideration, by a sale free from fraud in fact, cannot be followed. In some of the cases it is assumed that the assignee is a creditor and *bona fide* purchaser, as in *Swift* v. *Thompson*, 9 Conn. 63, a holding in conflict with principle and expressly repudiated in *Adams* v. *Lee*, 64 N. H. 421. Subsequent cases in Connecticut (*Chamberlain* v. *Thompson*, 10 Conn. 243, 254; *Rood* v. *Welch*, 28 Conn. 157, 163, 164; *Shipman* v. *Insurance Co.*, 29 Conn. 245, 253, 254; *Gaylor* v. *Harding*, 37 Conn. 508, 517, 518) have followed the decision in *Swift* v. *Thompson*, without further examination into the merits of the question. In other cases (*Allen* v. *Massey*, 1 Dill. 40; *S. C.*, 17 Wall. 351; *Edmondson* v. *Hyde*, 2 Saw. 205) the question received no adequate consideration.

In the present case it appears that Esty paid the company $4,000 for the property. It must be assumed that that money or its equivalent is now in the hands of the plaintiff, which he is holding for the benefit of the company's creditors. If that sum,

in his opinion, is less than the fair value of the property, he was at liberty under the contract of sale to reclaim the property upon a return of the money paid, with interest. But he cannot keep the money and recover the property or its value from the innocent vendee. The fact that the market value of the property was $4,207.62 is immaterial, in the absence of a finding of actual fraud. Upon that question, it might have been competent evidence for the plaintiff.

The defendant's motion that a verdict be directed in his favor should have been granted.

*Judgment for the defendant.*

PARSONS, J., did not sit: CHASE and PIKE, JJ., dissented: the others concurred.